[Civ. No. 414. Fifth Dist. Nov. 30, 1964.]

GEORGE W. PHILLIPS et al., Plaintiffs and Appellants, v. WESTERN CATTLE FEEDERS, Defendant and Respondent.

952

Robert F. Tyler for Plaintiffs and Appellants.

Bernard E. Hill, Thompson & Colegate and Don C. Brown for Defendant and Respondent.

CONLEY, P. J.—Vaquero Cattle Co., a copartnership, and Osage Cattle Co., a corporation, sued Western Cattle Feeders, as a result of the feeding by defendant of cattle owned by the respective plaintiffs at Blythe, California. Originally, each plaintiff sued separately, but because of the similarity of the issues the cases were consolidated.

Appellants make five contentions for reversal. These various claims are individualistic in nature and the decision as to one or more of them does not necessarily control the others. The first four claims are based on contract; the fifth on an alleged tort—malicious interference with business relations. The points urged by appellants are:

1) It is claimed that the Osage Cattle Co. was improperly charged for feeding certain cattle after the date of their sale on September 25, 1960, and that the new buyer rather than the plaintiffs should have been charged with these bills amounting to $1,883.43;

2) The appellants urge that neither of them should have been charged any interest on their feed bills, saying that by express oral agreement no such interest should be paid; these items amount to $2,328.68 as against Osage Cattle Co. and $1,497.34 against Vaquero Cattle Co.;

3) Appellants contend that it was contracted by the parties

that the cost of "finish feed" under the program would not exceed 23½ cents per pound of weight gained by the cattle, and that the Osage Cattle Co. was therefore improperly charged $7,918.08 over this maximum and the Vaquero Cattle Co. $9,089.56;

4) Appellants point out that at the beginning of their relationship, the respondent expressly agreed with them to carry all feed bills until appellants had sold each lot of cattle from the feed yard, thereby giving them an opportunity to sell each increment of cattle, move them to the buyers, collect the proceeds and only then to remit the amount of each feed bill to the respondent; it is appellants' contention that respondent deliberately violated this agreement by later refusing permission to remove any cattle from the yard unless plaintiffs first paid the bill by cashier's check;

5) The final contention of appellants is that the respondent was guilty of a tort by deliberately and maliciously interfering with the existing business relationship between them and their banking connection, California Bank, and also between them and actual and prospective purchasers, thus making it impossible for them to carry on their business.

All parties were engaged in some phase of buying young cattle and feeding, fattening, and selling them. Title to the stock here involved was in plaintiffs, subject to mortgages in favor of the California Bank; the actual feeding of the cattle for compensation was carried on by the respondent, Western Cattle Feeders, at its feed yard at Blythe, California.

The principal shareholders of the Osage Cattle Co. were Vaquero Cattle Co., a copartnership, consisting of George W. Phillips and his two sons, William R. Phillips and P. H. Phillips; Robert J. Eiel and his father (sometimes referred to as the Eiel Group); and Belton K. Johnson from the King Ranch in Texas. Its officers were George W. Phillips, president, and Robert J. Eiel, secretary. The Western Cattle Feeders was owned in March 1960 by the following interests: Vaquero Cattle Co. 15 per cent; Callaghan Land and Pastoral Company 25 per cent; and Blythe Western Company 60 per cent; the Vaquero Cattle Co.'s interest was sold during the business relationship.

Replacing the cattle drives that characterized marketing in the early stages of the stock raising industry in the southwest is the present scientific system of conditioning, "chop feeding" and "finish feeding" now carried on by various companies, including Western Cattle Feeders. The objective is to

care for and feed the cattle so as to cause them to reach optimum condition and maximum weight before sale. The owners of the stock so fattened and prepared for market pay the company conducting such operations for the services rendered in an amount usually based on the gain in weight made by the cattle. It is obvious from the record that this is an expensive and long-continued process. It is, of course, normal that credit arrangements be made with some bank to carry the financial burden, for a price, during the time that the cattle are being fattened, and the plaintiffs as well as the Western Cattle Feeders, had the California Bank as their financial supporter. The record indicates that this is potentially a highly lucrative, but at the same time risky, business, and that if the market price should go down, or if the appraisals are too high, difficulties immediately arise; time is of the essence.

Plaintiffs allege that in October 1959 they entered into the oral agreement for feeding on the basis of a conditioning program of from 10 to 14 days at a price from 20 to 25 cents a head per day, to be followed by an ensilage or "green chop" feeding program with compensation on a gain basis of 17 cents a pound, the cattle to be weighed in with a 4 per cent shrinkage allowance, and the plaintiffs having the privilege during this second step or "ensilage program" to determine the proper weight and time when the cattle should be moved to the final feeding program; that a "finish feeding" program followed with the cattle to be weighed, less a shrinkage allowance of 4 per cent; that the length of this last stage of the feeding program was to be decided by the plaintiffs; that the cost of gain in weight of the cattle on this third stage would not exceed 23½ cents a pound; that defendant would not require plaintiffs to pay each feed bill until plaintiffs had sold each lot of fattened cattle after the completion of the "finish feeding" program and had actually collected the sales receipts from each of the buyers.

In the complaint filed by the Vaquero Cattle Co., it was alleged that in November 1959, and continuing at intervals up to and including January 15, 1960, they placed 1,202 cattle in defendant's feed yard; and Osage Cattle Co. alleged that beginning on November 13, 1959, and continuing at intervals up to and including March 12, 1960, it placed 1,180 cattle in defendant's care; the defendant completed feeding operations for both herds.

The first item claimed to be erroneous by appellants is the charge of $1,883.43 against the Osage Cattle Co. after

the sale of certain cattle by it to Modern Meat Company. These cattle were covered by a sale contract based on the price of slaughtered beef as to which the price was yet to be ascertained. At the direction of George Phillips, the cattle were weighed and assigned a new lot number and the Osage Cattle Co. claims that the purchaser should have paid for the feed supplied to the cattle from that time until the actual shipment to the purchaser some days later. However, the appellants overlook relevant facts in making this contention; these cattle were sold not "on the hoof" but "on the hook"— that is to say, payment was to be made by the purchaser on the basis of the market value of the dressed beef and, consequently, there was not a complete and final agreement between buyer and seller at the time the feed was supplied. More important is the fact that the Osage Cattle Co. had previously made a definite contract for the feeding of the stock with Western Cattle Feeders, whereas the latter had had no contact whatsoever with the purchaser. The Modern Meat Company had not agreed with Western Cattle Feeders to pay the feed bill, and had not requested defendant that they be weighed or assigned another lot number. Therefore, it appears that the trial court had ample justification to find that the bill for the feed of the cattle in the interval between the agreement for their sale to Modern Meat Company and their actual shipment was a liability of Osage Cattle Co.

The charge of interest against the plaintiffs on their feed bills also finds support in the record by substantial evidence and the appellate court cannot, therefore, interfere with the charge by defendant of $2,328.68 against Osage Cattle Co. and against Vaquero Cattle Co. for $1,497.34. Unfortunately, the difficulty of the trier of fact in determining the accuracy of testimony in this case inheres principally in the fact that the contract between the parties was wholly oral. If there had been a written agreement, the trier of fact might more readily construe such an objective writing. Historically, a similar consideration led to the enactment of the statute of frauds. But apparently reliance is not placed upon writings as a general thing in the cattle business but rather upon oral interchange between the parties. Whether this is due to the nature of the business, or the lack of a literary tradition among cattle men, it places upon the trial court a heavy burden in sifting the oral evidence and finally ascertaining the truth. ■ And from the standpoint of an appellate court, if there is substantial conflicting evidence on an issue,

the trial court's finding one way or the other is conclusive. In this case, there was evidence which justified the decision of the trier of fact that there was never an express oral agreement of the parties waiving interest. We cannot disturb the finding of the trial court on this issue.

Similarly, on conflicting evidence, the lower court found against the contention of appellants that the contract placed a ceiling of 23½ cents per pound on gain of the cattle in the final feed program. As an appellate court, we cannot upset this finding as there is substantial evidence supporting the conclusion. This means that the trial court's determination of the charge against the Osage Cattle Co. in the sum of $7,918.08 and against the Vaquero Cattle Co. for $9,089.56, being the excess charges over the 23½-cent ceiling, cannot be disturbed. George W. Phillips testified that there was such an oral agreement as part of the contract made between the parties and Parley Richens, representing the defendant, gave evidence that no such agreement was ever made. In these circumstances, the finding which accepted Mr. Richens' testimony cannot be set aside by us.

But, contrary to the trial court's finding, the uncontradicted evidence of the plaintiffs, actually supported by the defendant's admission, is that the contract made between the parties was disregarded by the defendant through an unauthorized substitution by it for the agreement that the plaintiffs did not have to pay their feed bills until the completion of each sale, by a requirement that they settle their bills by a certified check in each event before the cattle covered by such sale would be released from the feed yard. This constituted an express breach of the contract by the defendant; while the plaintiffs at that time were engaged in what ultimately proved to be an unsound financial transaction, there had been no breach of the basic contract on their part; the California Bank had agreed, and now reiterated to defendant, that it would honor any bills against them for feed; there was no legal ground for the defendant to refuse to carry out its own contractual obligations.

On the first sale made by plaintiffs, defendant accurately observed its contract relative to the time and method of paying the feed bill. In August 1960 the Vaquero and Osage companies made sales of 85 and 89 head, respectively, to the Cudahy Packing Company; they shipped the cattle from Western Cattle Feeders' yards, collected from Cudahy, deposited the sales checks with the California Bank and then

issued drafts on the California Bank to Western Cattle Feeders for the feed bills on the cattle.

It was on the next series of sales by Vaquero and Osage, to the Modern Meat and Globe Packing Companies, that Western Cattle Feeders changed its position after unsuccessfully attempting to get plaintiffs to agree to such a modification of the contract. Parley Richens, the defendant corporation's general manager, called the president of the Globe Packing Company and an officer of the Modern Meat Company and secured their agreement to hold up payment to appellants of the funds owed by the two packing companies to plaintiffs. Thereafter, defendant would not permit the removal, after sale, of any cattle from the feed yard, until the plaintiffs first paid their feed bill by a cashier's check.

George W. Phillips testified that this new requirement of cashier's checks for feed bills before cattle would be released injuriously affected plaintiffs' business and stopped the use of the bank's line of credit for further cattle purchases. As an excuse for defendant's breach of contract, Mr. Richens testified that Western Cattle Feeders had built up a large equity in the cattle by extensive feeding and care and that there was insufficient money left in the market value of the cattle to pay the mortgages at the bank and the feed charges; Richens believed plaintiffs were allowing the cattle to remain on the "finish feeding" program too long. He concluded that if the directors of Western had not taken this action it would have lost all security for its feed bill. ▇ But fear of commercial loss in such circumstances does not excuse a breach of contract.

On October 3, 1960, Joseph Finley and Arnold Travis of Western Cattle Feeders met with Robert DeWalt, manager of the California Bank at Bellflower; DeWalt testified that Finley told him at that time that he had prevented the payment of a check due to appellants from either the Modern Meat or Globe Packing Company and that he would not consent to release these funds until Western's feed bill was paid; thereupon the bank manager dictated a letter to Western Cattle Feeders stating that the Osage Cattle Co. and the Vaquero Cattle Co. were indebted to the bank for extensive loans secured by chattel mortgages, and asking that it request all buyers to make their checks payable jointly to the seller, Western Cattle Feeders, and California Bank, and to mail them directly to the bank; he added that the bank understood Western Cattle Feeders' position regarding feed bills and

would honor that stand as to all funds due to Osage Cattle Co. and Vaquero Cattle Co. from buyers of their cattle. However, after receiving advice from the bank's counsel, Mr. DeWalt dictated a second letter to Western Cattle Feeders on the following day rescinding the first letter; later still the bank assured defendant that it would pay all bills against plaintiffs for feed, upon presentation.

Some damages, at least, were proven by plaintiffs as the proximate result of defendant's breach of contract. The testimony of George W. Phillips showed an increment of added expense to plaintiffs in carrying on their business:

"Q. (by Mr. Tyler) With reference to the trips you made from Los Angeles to Blythe, how did the payment on the Modern Meat sale and subsequent requirement of cashiers checks for feed bills effect [sic] you?

"A. If [sic] effected [sic] us in several ways: it reduced our work day and our relationship to buyers in the merchandising of our cattle to about one half of the work day for this reason: to pay feed bills with cashiers checks meant we could only purchase these checks during banking hours, which is 10:30 to 3:00 in the afternoon, and they were all purchased at the Farmers' and Merchants' Bank at Blythe, about 250 miles from Los Angeles.

"That required us extra driving and telephone calls to Blythe and to the buyers here and to the bank. It increased our trips to Blythe at least one extra trip a month for about four months.

"Telephone calls to packers and to Blythe increased oh, 35 to $40 a month over our usual phone bills.

"Q. When did the cattle generally roll out from the feed lot? A. The normal procedure in shipping out cattle is quite early in the morning before they are fed and watered to take advantage of the trip early in the cool hours in the morning to Los Angeles to reduce shrink, and it is a healthier situation for cattle.

"Q. And what condition did you find when you were required to obtain cashiers checks for the payment of feed bills? A. As a result of that we couldn't pay the feed bills on the cattle that were sold and to be shipped that morning until after 10:00 o'clock. We had to purchase a cashiers check to pay the representative of Western for the feed bills.

"Q. Could you have purchased the cashiers check on the day before? A. No, sir.

"Q. Why not? A. The cattle would be weighed up that

morning and then you used scale tickets, the book records of Western, to determine pro rata feed bills against this bunch of cattle.

"Q. How much additional travel expense was involved or resulted from these extra trips to Blythe you mentioned over the four month period—the last four months of 1960? A. Travel expenses—oh, probably $50 a month more expense.

"Q. How much would that total over a period of four months. A. Four months, about $200 plus hotels and meals.

"Q. What were your expenses on hotels and meals? A. Oh, that would be nominal. I don't believe that would be over $50.

"Q. During the four month period? A. Yes.

"Q. How about your phone expenses? A. Well, it created a 35 to $40 expense a month.

"Q. What would the total be over the four month period? A. Say $160.

"Q. How did this requirement of payment on the Modern Meat sales and subsequent requirements of cashiers checks effect [sic] the trips and number of conferences you had with your bank agency, namely, the California Bank? A. It increased the necessity to make trips into Los Angeles more frequent—maybe two, three or four times a week, to discuss this with the bank. Then plus telephone calls in town to the packers, buyers and the bank also."

There may be other damages. The admitted breach of the contract by the defendant cannot be justified irrespective of what damages, large or small, may have been proximately caused by it.

▮ In their fifth claim for reversal of the judgment, the plaintiffs each depend upon a theory of tort, alleging that the defendant maliciously interfered with their business relations with their banker and with potential purchasers, to the actual damage of each of them in the sum of $50,000 and an additional $25,000 in punitive damages. There is ample room in the evidence for the finding of the court that plaintiffs are not entitled to recover on this last cause of action; the trier of fact could well conclude from the evidence that defendant's alleged interference with plaintiffs' business relationships with others in the meat packing industry was not effected maliciously and that the talks with California Bank officials were legitimate; certain it is that the court could properly find that no damage from these alleged wrongful acts was proven. We cannot interfere with the trial court's conclusions as to the fifth point urged by appellants.

It would be wrong to determine that the lower court had no just ground for the judgment in favor of the defendant as to the first three points or the fifth point made by the appellants. It would be equally wrong to give approval to the trial court's unjustified conclusion with respect to the proven breach of the contract in connection with the fourth point made by the appellants. It is, accordingly, ordered that the judgment be reversed, and that the cause be remanded with instructions to the trial court to take further and additional evidence, if it be offered by either side, with respect to the damages caused by the breach of contract by the defendant as hereinbefore specified, and thereafter to make findings of fact and conclusions of law and enter a judgment in conformity with the views expressed in this opinion. (See: *Rice* v. *Schmid*, 25 Cal.2d 259, 263 [153 P.2d 313].) The appellants shall recover costs on this appeal.

Brown (R. M.), J., and Stone, J., concurred.